Filed 12/10/21  Guerrero v. Whole Foods Market Cal. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| JOSE GUERRERO, Plaintiff and Appellant, v. WHOLE FOODS MARKET CALIFORNIA, INC. et al, Defendants and Respondents. | B305799 (Los Angeles County Super. Ct. No. 19STCV02239) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Monica Bachner, Judge.  Affirmed.

Barrera & Associates, Patricio T.D. Barrera and Jeremy H. Herwitt, for Plaintiff and Appellant.

Sheppard, Mullin, Richter & Hampton, Derek R. Havel, Nora K. Stilestein, and Limore Torbati, for Defendants and Respondents.

Jose Guerrero (Plaintiff) was fired by his employer Mrs. Gooch's Natural Food Markets, Inc. doing business as Whole Foods Market (Whole Foods) for failing to abide by food safety rules. Plaintiff then sued Whole Foods and his former supervisor, Arthur Tolentino (Tolentino) for age and national origin discrimination, retaliation, harassment, and other claims. We consider whether the trial court correctly granted summary judgment for Whole Foods, and the answer to that question largely turns on whether Plaintiff put forward substantial evidence that Whole Foods' reason for firing him was pretextual and whether those responsible for the termination decision can be said to have acted with unlawful motivation.

## I. BACKGROUND

### A.  *Plaintiff's Employment as a Whole Foods Meat Cutter*

Plaintiff began working for Whole Foods in 1988 and, beginning in 2006, his job was that of a meat cutter. In 2018, Plaintiff was working Whole Foods' Newport Beach store after transferring there in 2016 from Whole Foods' West Los Angeles location. Plaintiff was 57 years old.

While working as a meat cutter, Plaintiff was repeatedly trained on Whole Foods' meat and food handling policies. Plaintiff accordingly understood that commingling of different species of meat and poultry products during cutting and grinding was prohibited by Whole Foods for a number of reasons, including public health concerns.[1]

---

[1]    A meat product with commingled types of meat may be hazardous, especially where the customer is unaware of the presence of more than one type. For instance, if two different types of meat are commingled without a customer's knowledge,

2

To prevent meat commingling, Whole Foods' "Grinding Policy/Guidelines," a document Plaintiff reviewed as recently as 2017 when he underwent retraining, specified that meat grinders must be cleaned and sanitized "between EVERY grind . . . . It is very important that all meat ground for our customers be ground in a clean and sanitized grinder each and every time meat is ground." The grinding policy guidelines also stated it was "crucial" to maintain accurate logs memorializing each time meat was ground. Pursuant to Whole Foods' "General Information Guide" for employees, "flagrant" disregard of food safety procedures was considered a "major infraction," which could result in discharge.[2]

### B. Plaintiff's Termination

On August 8, 2018, shortly before Plaintiff was about to leave work for the day around 1:00 p.m., Jacob Lilio (Lilio), the only other grinder in the meat department on duty at the time, asked Plaintiff to grind some pork. Plaintiff did so, but he did not clean the grinder or document his work in the grind log.[3] Instead, Plaintiff clocked out at 1:16 p.m. and left the store. Lilio used some of the pork ground by Plaintiff to prepare blueberry

---

the commingled product might not be cooked to a temperature sufficient to kill bacteria present in both types, thereby putting the customer's health at serious risk.

[2] Plaintiff acknowledged receiving the employee guide numerous times, including in April 2018.

[3] Plaintiff maintains he informed Lilio that he (Lilio) needed to log the grind and clean the grind machine.

breakfast sausages and placed the remainder in a display case for sale.

### 1. *The discovery of commingled meat*

Just minutes after Plaintiff left work, Craig Kittinger (Kittinger) and Patrick Wight (Wight) began a walk-through of the Newport store. Kittinger was a Whole Foods team leader responsible for performing internal audits of stores in the company's Southern Pacific Region for, among other things, food safety. When Kittinger and Wight entered the meat grinder room, they immediately noticed the grinder was dirty and had commingled meat (beef and pork) in it. Kittinger and Wight took photos of the grinder and informed one of the store's assistant managers, Nicolas Le Compte (Le Compte), who also photographed the grinder.

Kittinger and Wight interviewed Lilio and he told them Plaintiff performed the last grind. Kittinger and Wight inspected the pork ground by Plaintiff and discovered specks of dark beef among the white pork. The ground pork and the sausages prepared by Lilio were quarantined from sale and thrown away.

### 2. *Whole Foods' investigation and termination decision*

After discovering the comingled meat, Wight and Le Compte emailed photos of the grinder to others including Brian Reese (Reese), the manager of the Newport store; Mark Martinez (Martinez), the Southern Pacific Region meat team coordinator; and Shelly Pope (Pope), a senior member of Whole Foods' human resources department.

4

After receiving the emailed photos of the grinder, Reese arrived at the Newport store approximately an hour and a half after Plaintiff left.  He inspected the grinder and the ground pork that had been placed in a case for sale and determined that there was commingled meat in both.

Reese interviewed Lilio, who said Plaintiff ground the pork at his request and, to Lilio's knowledge, no one other than Plaintiff had used the grinder.  Reese also interviewed Anderson Arias-Bracamonte (Arias-Bracamonte), who Lilio said was also present when the commingled grind took place.  Arias-Bracamonte, a member of the seafood department with no responsibility for performing beef or pork grinds, denied doing any grinding that day.  Tolentino, Plaintiff's immediate supervisor, was not involved in the investigation because he had left the store at 12:44 p.m., approximately 15 minutes before Lilio asked Plaintiff to perform the pork grind.

On the day after discovery of the commingled meat grind, Reese interviewed Plaintiff.  Tolentino was present in the room during Reese's interview of Plaintiff but he did not actively participate in the interview.  Reese showed Plaintiff photographs of the grinder and Plaintiff acknowledged his last grind on the prior day was pork (done at Lilio's request) and he did not clean the grinder or document the grind on the meat grinding log.  Plaintiff also provided a signed written statement stating in pertinent part: "On 8/9/18[4] as I was getting ready to leave for the day, [Lilio] asked me last minute to grind pork for the oven[-]ready set prep.  I then went to the back and got the trim.  I

---

[4]     At his deposition, Plaintiff admitted the date on his statement was incorrect and he meant to refer to August 8, 2018.

checked the grinder and it had pork on it [as pork] is always my last grind. I then put the pork in the grinder and ground the pork." Though Tolentino was present for Reese's interview of Plaintiff, Tolentino was not copied on any of the subsequent email correspondence among Whole Food's personnel about how to respond to what happened.

Later that same day, after reviewing employee time-record data and schedules, Reese sent an email to human resources employee Pope, meat team member Martinez, and others advising Plaintiff was responsible for the comingled grind, which he characterized as a major food safety and policy violation.[5] Reese added that Plaintiff "has been with us for 20 plus years so he knows what to look for and what our policy is." Attached to Reese's email were photos of the dirty grinder and a copy of Plaintiff's written statement.

The next day, after reviewing the photographs, Martinez sent a reply email opining "it clearly looks like pork was ground in same grinder as beef, pork probably after beef. [¶] . . . [¶] I feel it is a major infraction." Pope inquired via email about grind log data and Plaintiff's training. Reese's response stated the logs indicated Plaintiff had performed the last four grinds prior to the unlogged grind he performed at Lilio's request and Plaintiff had been trained on Whole Foods' Grinding Policy/Guidelines as recently as June 2017.

Based on his investigation, Reese concluded Plaintiff should be fired because his conduct constituted a major infraction of the company's food safety policies. Pope, who independently

---

[5]     In his email of August 9, 2018, Reese incorrectly stated the comingled grind was discovered on August 9, not August 8. In a subsequent email, Reese corrected his mistake.

6

examined the photographs of the grinder, the grinder logs, employee work schedules, and Plaintiff's written statement, concurred. Tolentino, who did not have the authority to terminate Plaintiff, was not asked for his views and did not volunteer them.

Three weeks after the discovery of the comingled meat, Reese advised Plaintiff that his employment was being terminated for commingling different species of meat, failing to clean the grinder, and failing to log his last grind.

### 3. *Plaintiff's appeal of his termination*

A week after being terminated from his position, Plaintiff internally appealed the termination decision. Plaintiff maintained "the people in charge did not give [him] the opportunity to explain [his] side or state what happened in actuality." Plaintiff did not assert he was terminated because of his age, ancestry, national origin, or any requests for medical leave.

Because Pope had already been involved in the decision to terminate Plaintiff's employment, Whole Foods assigned Teresa Bronson (Bronson), the team leader in Whole Foods' human resources department responsible for the Southern Pacific Region, to handle Plaintiff's appeal. Prior to this assignment, Bronson had never met Plaintiff and was unaware of his age, ancestry, national origin, or any medical condition.

Bronson interviewed Plaintiff by phone, using the services of a Spanish language interpreter. Plaintiff denied he was responsible for comingling meat products. He conceded, however, that he performed a pork grind for Lilio prior to leaving for the day, he did not clean the grinder after completing the grind, and

7

he did not log the grind. Plaintiff also admitted he understood that his failure to clean the grinder and log the grind were policy violations and that commingling meat products could result in termination. During his telephone interview with Bronson, Plaintiff did not report any mistreatment on the basis of age, ancestry, national origin, or medical condition. The purpose of the call, from Plaintiff's perspective, was to request reinstatement because he enjoyed working for Whole Foods "100 percent."

After interviewing Plaintiff, Bronson reviewed email correspondence regarding the incident, photographs of the grinder, Plaintiff's written statement, the grind logs, time records for employees who worked in the Newport store's meat and seafood department, and training records. To more fully understand the grind logs, Bronson consulted with an associate meat coordinator. Bronson also spoke with a meat field associate, who confirmed the photographs indicated pork was ground after beef without the grinder being cleaned between the two grinds. In addition, Bronson interviewed several others, including Reese, Tolentino, Kittinger, Wight, Le Compte, and Pope.

After completing her review of the evidence, Bronson upheld Plaintiff's termination. Reese eventually hired Octavio Rodriguez, a 49-year-old Latino man, for the meat cutter position left open after Plaintiff's termination.

### C.    *Plaintiff's Lawsuit*

Months later, Plaintiff sued Whole Foods and Tolentino for age discrimination, discrimination on the basis of ancestry or national origin, retaliation, harassment, failure to prevent

8

discrimination or harassment, and wrongful termination in violation of public policy. According to the complaint, Plaintiff was subjected to ageist comments by Tolentino, who purportedly referred to Plaintiff as "slow" and "lazy,"[6] and by Reese who allegedly told him he would not have been terminated if he had been "younger." Plaintiff also alleged Whole Foods discriminated against him on the basis of his national origin because a White male co-worker at Newport store who violated company food safety (the co-worker allegedly failed to wear a metal safety glove and cut his hand, thereby spilling blood in the meat department) was not terminated. Plaintiff further alleged he was harassed by Tolentino because of his age and because he told Tolentino a month before he (Plaintiff) was fired that he may need to use medical leave to get treatment for a hernia. Plaintiff contended defendants retaliated against him for complaining about Tolentino's ageist comments and for requesting medical leave.

### D. Defendants' Motion for Summary Judgment

Defendants moved for summary judgment. On the discrimination causes of action, defendants argued Plaintiff could not establish a prima facie case of discrimination and, even if he could, Whole Foods had a legitimate, nondiscriminatory reason for firing him (the food safety violations) that a trial jury could not find pretextual. Defendants argued the retaliation cause of action was defective because Plaintiff could not establish a causal

---

[6] At a later deposition, Plaintiff would describe another incident in which he claimed to overhear Tolentino say he would not hire someone who applied for a meat cutter position because the applicant, who appeared to be 55 to 60 years old, was "too old."

9

link between his termination and any protected activity; neither Reese nor Pope, the people responsible for making the decision to fire Plaintiff, were aware of Plaintiff's complaint about ageist comments by Tolentino or Plaintiff's statement that he might have to take time off in the future for hernia treatment. The harassment claim failed, in defendants' view, because there was no evidence of severe or pervasive conduct to support a harassment cause of action; the age-related comments Plaintiff claimed to have heard Tolentino make occurred on one occasion four months before Plaintiff's termination.

Plaintiff opposed defendants' motion for summary judgment. In an effort to show Whole Foods' reason for firing him was pretextual, Plaintiff pointed in several directions: Reese's error in initially identifying the date of the commingled meat grind as August 9 (instead of August 8); Tolentino's own asserted failure on the day of the incident to comply with Whole Foods' food safety policies (according to the grind logs, Tolentino improperly logged certain grinds he performed as having been performed by Plaintiff); Reese's knowing approval of Tolentino's false entries on the grind log; and Reese's failure to have an interpreter present when he interviewed Plaintiff on the day after the incident. Plaintiff also contended he was treated differently from other employees, including Lilio—who was neither investigated nor disciplined by Whole Foods even though he was the one who asked Plaintiff to grind the pork. Plaintiff additionally observed that Whole Foods did not fully comply with its own Grinding Policy/Guidelines because the Newport store was the only store in the region with only one meat grinder when the guidelines specified two grinders should be located in each store to avoid the risk of commingled meat.

Plaintiff's declaration submitted in support of his opposition averred he feared discrimination and retaliation from Tolentino because he once watched him throw an angry tantrum when one of Plaintiff's coworkers called in sick. Plaintiff further declared that, during his termination interview, Reese told him he would not have been terminated if had been a "younger," less experienced worker. In addition to his own declaration, Plaintiff submitted the declaration of Margarita Cardona (Cardona), a former co-worker who stated she heard Tolentino describe Plaintiff in January 2017 (some 20 months before his termination) as "old," "slow," and "breaking down." When Cardona told Plaintiff about these remarks, Plaintiff complained directly to Tolentino. Plaintiff also filed evidentiary objections to the declarations of Reese, Pope, Lilio, and Bronson submitted in support of defendants' motion.

Defendants' reply memorandum of points and authorities argued there was no evidence any decision-maker was motivated by Plaintiff's age, ancestry, age-related comments by Tolentino, or by the possibility that Plaintiff might seek leave to treat his hernia sometime in the future. Defendants also filed evidentiary objections to Plaintiff's evidence, including the declarations submitted by Plaintiff and Cardona.

### E. The Trial Court's Ruling

At the hearing on defendants' motion for summary judgment, Plaintiff focused much of his argument on what is often confusingly called the "cat's paw" doctrine; we shall refer to

11

it as the imputed motivation doctrine.[7]  The doctrine imputes discriminatory animus harbored by one actor to another actor who is (at least partly) responsible for taking the adverse action against an employee.  (See generally *DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 551 ["[S]howing that a significant participant in an employment decision exhibited discriminatory animus is enough to raise an inference that the employment decision itself was discriminatory, even absent evidence that others in the process harbored such animus.  [¶]  This legal principle has been colorfully referred to as the 'cat's paw' doctrine"] (*DeJung*); *Llampallas v. Mini-Circuits, Lab, Inc.* (11th Cir. 1998) 163 F.3d 1236, 1249 ["[E]ven when the harasser . . . is not the decisionmaker, if the plaintiff shows that the harasser employed the decisionmaker as her 'cat's paw'—i.e., the decisionmaker acted in accordance with the harasser's decision without herself evaluating the employee's situation [citation]—causation is established"].)  Relying on this imputed motivation doctrine, Plaintiff argued Tolentino's "fingerprints [we]re all over" the firing decision.  In response, defendants maintained the doctrine was inapplicable because Tolentino was neither involved in nor consulted on the termination decision.  The court took the mater under submission.

In a subsequently issued 26-page order, the trial court granted defendants' motion for summary judgment.  In reaching

---

[7]  Plaintiff's summary judgment opposition did not discuss or refer to the doctrine.  Defendants argued Plaintiff waived any right to rely on imputed motivation doctrine by not discussing it in his opposition, but the trial court considered and rejected an imputed motivation theory of discrimination in its order granting summary judgment.

12

its decision, the trial court sustained and overruled various evidentiary objections by the parties without explanation. Among other things, the court sustained defendants' objections to Plaintiff's statements in his declaration about Tolentino's tantrum and Reese's purported statement that Plaintiff would not have been terminated if he had been younger. The court also sustained Plaintiff's objection to defendants' rebuttal evidence. Plaintiff did not ask for clarification of any of the court's evidentiary rulings.

On the discrimination causes of action, the trial court found there was no evidence that those responsible for making the decision to terminate Plaintiff (Reese and Pope) harbored discriminatory motives.[8] The court rejected as insufficient Plaintiffs' various attempts to undermine defendants' proffered reason for terminating him as pretextual (e.g., arguments about different policy violations by Tolentino and the White male coworker who cut his hand, the references to the incorrect August 9th date during Whole Foods' investigation, and what Plaintiff believed was an undue investigative focus on him). The court further found Plaintiff's effort to establish a triable issue of fact on an imputed motivation theory was unavailing because the evidence indicated Tolentino's involvement in Whole Foods' investigation of the commingled meat grind was negligible and there was no evidence he influenced Reese and Pope's termination decision.

On the harassment cause of action, the trial court found Plaintiff failed to establish he was subjected to severe or

---

[8]     In the same vein, the court specifically found there was no evidence Reese or Pope were made aware of any ageist comments by Tolentino.

13

pervasive harassment as a result of his age or disability. Assuming Tolentino made the ageist comments attributed to him, there was still no evidence these comments unreasonably interfered with Plaintiff's work performance.

On the retaliation claim, the trial court found Plaintiff had no prospect of prevailing at trial because the evidence indicated Reese and Pope were unaware of Plaintiff's statement to Tolentino that he may need to use medical leave at some point in the future to treat his hernia or of the time when Plaintiff confronted Tolentino about his use of ageist language overheard by coworker Cardona.

Because Plaintiff failed to raise a triable issue of material fact with regard to his causes of action for discrimination, harassment, and retaliation, the trial court found defendants were entitled to judgment as a matter of law on Plaintiff's derivative causes of action for failure to prevent discrimination or harassment and wrongful termination in violation of public policy.

## II. DISCUSSION

The trial court correctly concluded defendants were entitled to judgment as a matter of law.[9] No trial was required on

---

[9] Plaintiff's challenge to the trial court's evidentiary rulings on summary judgment, which even he concedes do not "advance specific evidentiary arguments" are not adequately presented and are deemed waived for that reason. (See, e.g., *Trinity Risk Management, LLC v. Simplified Labor Staffing Solutions, Inc.* (2021) 59 Cal.App.5th 995, 1008 [""When an appellant fails to raise a point, or *asserts it but fails to support it with reasoned argument and citations to authority*, we treat the point as

14

Plaintiff's discrimination causes of action because he did not present substantial evidence that Whole Foods' stated reason for firing him—his failure to comply with food safety policies—was pretextual.  No trial was required on Plaintiff's harassment cause of action because there was no evidence that would permit a jury to find any comments by Tolentino unreasonably interfered with Plaintiff's work performance or that Plaintiff himself perceived his work environment to be hostile.  (Indeed, the evidence was quite the contrary: Plaintiff testified he enjoyed his work at Whole Foods "100 percent" and wanted to return following his discharge.)  No trial was required on Plaintiff's retaliation cause of action because there was no dispute of fact on causation; specifically, there was no evidence the corporate actors responsible for terminating Plaintiff's employment were aware he engaged in any protected activity.  The remainder of Plaintiff's causes of action are all derivative of the claims we have already mentioned, and no trial was accordingly necessary on those either.

### A.     Defendants Were Entitled to Judgment as a Matter of Law on the  Discrimination Causes of Action Because Plaintiff Did Not Raise  a Triable Issue of Pretext

A defendant employer may seek summary judgment on a former employee's discrimination claim by presenting "competent, admissible evidence" that the defendant took action

---

waived"""]; *Delta Stewardship Council Cases* (2020) 48 Cal.App.5th 1014, 1075 [refusing to address parties' claims due to its "conclusory presentation" because "conclusory claims of error are deemed to be without foundation and require no discussion by the reviewing court"].)

against the plaintiff for a legitimate, nondiscriminatory reason. (*Guz v. Bechtel National, Inc*. (2000) 24 Cal.4th 317, 357 (*Guz*).) Absent direct evidence of discrimination—and there is none here[10]—a plaintiff must defeat summary judgment "by pointing to evidence which . . . raises a rational inference that intentional discrimination occurred." (*Ibid.*; *Soria v. Univision Radio Los Angeles, Inc*. (2016) 5 Cal.App.5th 570, 582 [a plaintiff employee may establish pretext by showing ""the proffered reason had no basis in fact, the proffered reason did not actually motivate the discharge, or, the proffered reason was insufficient to motivate discharge""].) If there is no substantial evidence that the nondiscriminatory reason proffered by the employer is pretextual, summary judgment for the defendant will be appropriate. (*DeJung*, *supra*, 169 Cal.App.4th at 553 ["[T]he employee must demonstrate a triable issue by producing substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with a

_____

[10]     Plaintiff argues there was direct evidence in the form of Tolentino's ageist comments made long before Plaintiff was fired (as well as evidence the trial court excluded that we do not consider). The comments, however, came well before Plaintiff was fired and do not constitute direct evidence of discrimination, which is rarely found. (*Trop v. Sony Pictures Entertainment, Inc.* (2005) 129 Cal.App.4th 1133, 1148; *DeJung, supra*, 169 Cal.App.4th at 550 ["Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption. Comments demonstrating discriminatory animus may be found to be direct evidence if there is evidence of a causal relationship between the comments and the adverse job action at issue"]; see also *Guz, supra*, at 354 ["[D]irect evidence of intentional discrimination is rare"].)

16

discriminatory animus, such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination"]; see also *Guz*, *supra*, at 362 [summary judgment for employer appropriate where, "given the strength of the employer's showing of innocent reasons, any countervailing circumstantial evidence of discriminatory motive, even if it may technically constitute a prima facie case, is too weak to raise a rational inference that discrimination occurred"].)

In support of its motion for summary judgment, defendants adduced strong evidence of a legitimate, nondiscriminatory reason for terminating Plaintiff: his failure to comply with Whole Foods' food safety rules by commingling different species of meat, failing to clean the grinder, and failing to log his last grind. Supporting this reason were time records, employee schedules, grind logs, interviews with percipient witnesses, consultations with meat experts from outside the Newport store, and Plaintiff's own admission of committing major infractions (not cleaning the grinder after his last grind or logging that grind) first to Reese and later to Bronson.

The evidence Plaintiff offered to show this reason was mere pretext for discrimination is arguably nonexistent and certainly insubstantial. Plaintiff chiefly relies on Tolentino's alleged bias against Plaintiff. The problem for Plaintiff, however, is he has presented no evidence—substantial or otherwise—that Tolentino played a significant role in his firing.

Under the imputed motivation doctrine Plaintiff raised late in the summary judgment process, he must adduce evidence "that a *significant participant* in an employment decision exhibited discriminatory animus." (*DeJung*, *supra*, 169 Cal.App.4th at 551, italics added; accord, *Reeves v. Safeway Stores, Inc*. (2004) 121

17

Cal.App.4th 95, 110 [plaintiff can establish causation by showing that any "substantial contributor[ ]" to the decision bore the requisite discriminatory animus]; see also *Husman v. Toyota Motor Credit Corp*. (2017) 12 Cal.App.5th 1168, 1189-1190, 1192 [reversing summary judgment in employer's favor because executive who made discriminatory remarks was part of a management committee which oversaw all termination decisions and participated in plaintiff's termination decision through "extensive discussions" with the decision-maker].)

The documents and deposition excerpts upon which Plaintiff relies show, at most, two things: (1) Tolentino was effectively a potted plant presence[11] during the interview with Reese and (2) Tolentino later told Plaintiff not to worry as it was likely he would only get written up for his policy violations. That is not enough to make Tolentino a significant participant. Tolentino did not discover the commingled meat or initiate the investigation (having left the store before Plaintiff on the day in question); Reese, Pope, and others obtained virtually all information sought during their investigation from other sources (and the information Tolentino did give Reese about Plaintiff's training was duplicative of other sources); Tolentino was excluded from the email correspondence between and among the Newport store's management, the regional meat team's leadership, and Whole Foods' human resources department about

---

[11] Joint Hearings Before the Sen. Select Com. on Secret Military Assistance to Iran and the Nicaraguan Opposition, and the House Select Com. to Investigate Covert Arms Transactions with Iran, 100th Cong., 1st Sess., p. 263 (1987) ["Mr. Sullivan[:] I'm not a potted plant. I'm here as a lawyer. That's my job"].

how to respond to the food safety violation; and Tolentino had no authority to terminate Plaintiff.

Plaintiff also suggests an adequate summary judgment pretext showing on his national origin discrimination claim is made by looking to other employees who did not comply with Whole Foods rules but were not fired (e.g., Reese, Tolentino, and the employee who cut his hand when not wearing a protective glove). The comparisons are not probative of pretext, however, because the circumstances of the asserted rules violations are markedly different. No reasonable jury could view Plaintiff's complaints of dissimilar rules violations by other employees (or of the absence of two meat grinding machines in the Newport store) and conclude any or all suffice to show Whole Foods really fired Plaintiff because of his El Salvadorian origin and not because of his admitted meat grinding failures that led to unsafe commingled meat.

In the absence of substantial evidence that Whole Foods' food safety rules reason for firing Plaintiff was mere pretext for discrimination, and with a wealth of evidence that this reason had a basis in fact and actually motivated the discharge, the trial court correctly concluded defendants were entitled to judgment as a matter of law on Plaintiff's discrimination causes of action.

> B. *Defendants Were Entitled to Judgment as a Matter of Law on the Harassment Cause of Action Because There Was No Evidence the Alleged Harassment Unreasonably Interfered with Plaintiff's Work Performance*

"[A]n employee claiming harassment based upon a hostile work environment must demonstrate that the conduct

19

complained of was severe enough or sufficiently pervasive to alter the conditions of employment and create a work environment that qualifies as hostile or abusive to employees because of their [protected status]." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 462; see also *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 130-131 [a plaintiff must prove that the defendant's conduct would have interfered with a reasonable employee's work performance and would have seriously affected the psychological well-being of a reasonable employee].) To be actionable, a working environment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.' [Citations.]" (*Lyle v. Warner Bros. Television Prods.* (2006) 38 Cal.4th 264, 284.) "[A]nnoying or 'merely offensive' comments in the workplace are not actionable." (*Id.* at 283.)

Plaintiff's harassment claim rests on two comments by Tolentino: the first, which was made in Plaintiff's presence four months before his termination, was that he wanted to hire a "younger" meat cutter; the second, which was heard by Cardona more than a year earlier and relayed to Plaintiff, was that Tolentino described Plaintiff as "old," "slow," and "breaking down."[12] Objectively, a jury could not find the comments on these two occasions are severe or pervasive enough to create a hostile work environment. (See, e.g., *Jones v. Department of Corrections & Rehabilitation* (2007) 152 Cal.App.4th 1367, 1378-1379

[12] Although Plaintiff alleged in his complaint the harassment involved both his age and his medical condition, he testified at his deposition that neither Tolentino nor anyone else at Whole Foods ever made any inappropriate comments about his hernia or his need for treatment.

20

[summary judgment appropriate where alleged sex harassment constituted discrete, insufficiently severe events].)  Subjectively, the evidence also shows Plaintiff did not regard Tolentino's comments as creating a hostile work environment.  He presented no evidence that his work performance suffered as a result of the alleged harassment and he in fact conceded that he enjoyed his tenure at Whole Foods "100 percent" and wanted to be reinstated.

On the summary judgment record, no reasonable trier of fact could find Tolentino's comments sufficient to create a hostile work environment.

C.      *Defendants Were Entitled to Judgment as a Matter of Law on the Retaliation Cause of Action Because Those Responsible for Making the Termination Decision Were Not Aware of Any Protected Activity by Plaintiff*

"[I]n order to establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action."  (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042.)  Courts have observed that proof of retaliation often depends on circumstantial evidence because it consists of "subjective matters only the employer can directly know, i.e., his attitude toward the plaintiff and his reasons for taking a particular adverse action."  (*Mamou v. Trendwest Resorts, Inc.* (2008) 165 Cal.App.4th 686, 713.)  As a result, "'[t]he causal link may be established by an inference derived from circumstantial evidence, "such as the employer's knowledge that the [employee] engaged in protected activities and the proximity in time between the protected action and the

allegedly retaliatory employment decision."'" (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 615.)

Here, there was no evidence of a causal link between the protected activity (Plaintiff's complaint to Tolentino about his ageist comments or Plaintiff's advisement to Tolentino that he might need to take medical leave sometime in the future to treat his hernia) and the decision to terminate his employment. The corporate actors responsible for the termination decision (Reese and Pope) and its subsequent ratification (Bronson) were not aware of any protected activity by Plaintiff. (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 74 [affirming summary judgment for employer because "each of the individuals who decided not to hire appellant for a particular position disclaimed knowledge of the fact that appellant had previously filed a grievance against the University. Without such knowledge, these individuals could not have acted in retaliation for appellant's filing of the grievance"].)

### D. *Plaintiff's Derivative Causes of Action*

Because we conclude Plaintiff failed to establish any genuine issues of material fact that could reasonably support a decision in his favor on his FEHA discrimination, retaliation, and harassment causes of action, his failure to prevent discrimination or harassment and wrongful termination in violation of public policy claims necessarily fail.

DISPOSITION

The judgment is affirmed.  Defendants shall recover their costs on appeal.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, Acting P. J.


We concur:



MOOR, J.



KIM, J.